**In re the Estate of**
Jose **Ogumoro**, Deceased.
Appeal No. 93-007
Civil Action No. 91-0078
June 13, 1994

---

Argued and Submitted June 24, 1993

Counsel for appellants, estate co-administrators Daniel R. Ogumoro and Felicidad T. Ogumoro: Jeanne H. Rayphand & Theodore R. Mitchell, Saipan.

Counsel for appellees Sita O. Phillip and other heirs of Nicolas L. Ogumoro: Reynaldo O. Yana, Saipan.

BEFORE: DELA CRUZ, Chief Justice, and VILLAGOMEZ and ATALIG, Justices.

DELA CRUZ, Chief Justice:

In this appeal, the co-administrators of the estate of Jose Ogumoro ("estate" or "appellants") contend that a title determination issued in 1952 in the names of "the heirs of Nicolas Ogumoro represented by Luis Ogumoro as land trustee" should be set aside. We are asked to decide whether a certain parcel of land that was originally owned by Jose Ogumoro ("Jose"), a male of Carolinian descent, is Carolinian family land subject to Carolinian customary law on land succession.

The trial court ruled that by virtue of the 1952 title determination, the heirs of Nicolas Ogumoro alone own the property. It found the title determination to be adequately supported by the record.

The estate administrators disagree. They contend that the land is Carolinian family land and, therefore, that all of Jose's heirs, who include Nicolas's heirs, have an ownership interest in the property, with the oldest female heir as customary land trustee.

We have jurisdiction over this appeal. 1 CMC § 3102(a). Although we find that the land is not Carolin-

ian family land, we hold that the land belongs to Jose's estate. For the following reasons, we vacate the trial court's order and remand for distribution of the subject land in a manner consistent with this opinion.

I

Jose died sometime before 1912. At the time of his death he owned land identified as Tracts 1833 and 1855 in Garapan, Saipan ("Lots 1833 and 1855" or "Garapan land"). He was survived by three sons: Nicolas, the eldest, Pedro, and Luis, the youngest.

Luis, Jose's last surviving son, died in 1965. Only he and Nicolas had surviving children. Pedro died without children.

In 1952, Determination of Ownership 392 ("TD 392"), encompassing Lots 1833 and 1855, was issued by the Trust Territory Land Title Office in the name of "the heirs of Nicolas Ogumoro represented by Luis Ogumoro as land trustee." In 1954, Luis, as land trustee, executed "Agreement to Exchange Lands No. 442," agreeing to exchange the Garapan land for public land situated at Talofofo, Saipan ("the Talofofo land"), the land at issue here. In May 1985 the Northern Mariana Islands Land Commission ("Land Commission" or "Commission"), the Commonwealth agency responsible for land registration, issued separate determinations of ownership for the three parcels making up the Talofofo land.[1] Titles to these parcels were issued in the name of "the heirs of Nicolas Ogumoro represented by Luis Ogumoro as land trustee."

Earlier, on or before February 5, 1985, the Land Commission held a formal hearing "concerning Exchange Agreement No. 442."[2] *See* Exhibits K, L and M *in* Appellant's Excerpts of Record ["ER"]. The Land Commission did not re-examine the question of ownership, as no adverse claim was made with regard to the Talofofo land. ER at 72, 77 and 82. It only examined whether the exchange agreement was "satisfactory for making a determination of ownership." *Id.* at 71, 76 and 81.

At the hearing, Daniel Ogumoro ("Daniel") appeared and noted that the owners of the subject land were

---

[1] The Talofofo land consists of Lots EA-422 (1 of 3), EA-422 (2 of 3) and EA-422 (3 of 3).

[2] The record is confusing as to the date of this hearing. Three "Summary of Hearing" documents note that it took place on May 27, 1982. Appellant's Excerpts of Record ["ER"] at 72, 77 and 82. Yet, each of the three summary of hearing documents were dated February 5, 1985, by the chairman of the land registration team. *Id.* at 73, 78, and 83.

mistakenly identified as being the "[h]eirs of Nicolas." *Id.* at 78. He informed the Land Commission that the subject land was "([p]rewar [p]roperty) owned by Jose Ogumoro, deceased" and requested amendments to the ownership determinations to show that all of Jose's heirs owned the subject land. *Id.* at 73. The Commission ignored Daniel's request to correct TD 392. The record below shows that the Commission's May 1985 ownership determinations relied on TD 392, issued 32 years earlier.[3] *Id.*, Exhibits K, L, and M.

After the Land Commission issued its ownership determinations, Sita Ogumoro Phillip ("Sita," the appellee and representative of Nicolas's heirs in this action, and his only surviving child), Daniel (co-administrator of Jose's estate and Luis's only son) and Hainrick Ogumoro (Nicolas's grandson) jointly wrote a letter to the Commission on January 29, 1986, requesting that the Commission determinations of ownership be amended to state that "the [h]eirs of Jose Ogumoro, deceased" were the owners of the Talofofo property.[4] ER at 94. Again, the Commission ignored this request.

The record shows that after the Land Commission determinations of ownership for the Talofofo land were issued, the parties agreed that the determinations were in error. Specifically, Daniel and Sita wrote the previously-noted letter to the Commission. This letter shows that the parties in this action agreed that all of Jose's heirs owned the Talofofo land received in exchange for Lots 1833 and 1855. There was, thus, no appeal taken from the Commission's ownership determinations. The present dispute arose when Jose's estate was probated.

The estate administrators included the Talofofo land in the inventory of estate assets and in their petition for final distribution. Nicolas's heirs objected. Contrary to their earlier position, they contended that the Talofofo land belonged exclusively to Nicolas's heirs. They claimed that Nicolas "inherited" the Garapan land from Jose.

The trial court declined to set aside the supporting title determinations. It ruled that the Talofofo land belonged solely to Nicolas's heirs. The court decided that TD 392 was a final adjudication, supported by Trust Territory land records. It also stated that the appellants'

failure to bring an action to quiet title pursuant to 2 CMC § 4249 within 120 days of the issuance of the Land Commission determinations of ownership barred their claim under the principles of administrative res judicata. In its ruling, the court primarily relied on three documents allegedly supporting TD 392.

The first document was Pedro's "Statement of Death or Disappearance of Owner or Lessee," dated January 28, 1945. ER Exhibit B. In it, Pedro stated that Nicolas died at Camp Susupe in 1944 and that Nicolas "inherited" Lots 1833 and 1855 from Jose in 1912. Pedro also listed Nicolas's "living relatives" as "Pedro," "Luis" and Nicolas's three children. The court interpreted the statements made in this document to be admissions by Pedro that Nicolas owned the land individually.

The second document was Pedro's "Report of Property Owner," dated February 14, 1948. ER Exhibit C. In this document, Pedro identified himself as the "present owner" of the land. The court interpreted the document as contradicting Pedro's earlier statement and found that "the reliability of the statement that Pedro owned the property is thus dubious." *In re Estate of Ogumoro*, Civ. No. 91-0078 (N.M.I. Super. Ct. Feb. 9, 1993) (Opinion and Order at 8).

The third document was an undated, handwritten statement by Luis apparently made after Pedro's death. In this document, Luis related that the land was "own[ed] by Luis Ogumoro" and Nicolas's children and that the "above land has been inherited from [our] Father Jose Ogumoro in 1910." ER Exhibit D. The trial court concluded from this statement that "Luis not only failed to assert any claim of co-ownership that he had in the land but also admitted that the children of his brother owned the land." *Ogumoro, supra*, Opinion and Order at 8.

The court reasoned that because the three documents supported TD 392, it could not be set aside. Based on our analysis, however, we find the record patently inadequate to support Nicolas's sole ownership of the land.

## II

■ The estate raises three interrelated issues for our review. The dispositive issue is whether the trial court erred in excluding the Talofofo land from the inventory of the estate's assets on the ground that Nicolas owned the land individually.[5] To reach this issue we must first

---

[3] The summary of hearing documents note that an "Application for Registration of Land Parcel" was also part of the record considered by the Land Commission. This document was not made part of the trial court's record or the record on appeal. ER, *supra* note 2, Exhibits K, L and M.

[4] The signature that appears on the January 29, 1986, letter is "Sita Ogumoro." The appellee, Sita Ogumoro Phillip, does not dispute that this is her signature.

[5] The other issues raised are (1) "whether the record pertaining to Title Determination No. 392, dated October 2, 1952, is patently inadequate to support a decision that the land

determine whether the trial court erred in failing to set aside TD 392. We will then review the court's order regarding the 1985 Land Commission ownership determinations, which were based on TD 392.

Since this issue involves the application of administrative res judicata principles, our review is de novo. *In re Estate of Kaipat*, 3 N.M.I. 494, 497 (1993); *Pangelinan v. Tudela*, 3 N.M.I. 233, 237 (1992).

## III

The estate contends that TD 392 and the Land Commission ownership determinations based thereon should be set aside because the records supporting those administrative adjudications are patently inadequate. We agree.

■ Generally, the doctrine of administrative res judicata bars an action which has been the subject of a final administrative decision. We have recognized a narrow exception to this general rule. An administrative adjudication such as a land title determination may be set aside only if "it was (1) void when issued, or (2) the record is *patently inadequate* to support the agency's decision, or if according the ruling res judicata effect would (3) contravene an overriding public policy or (4) result in a manifest injustice." *In re Estate of Dela Cruz*, 2 N.M.I. 1, 11 (1991).

Here we are confronted not only with the administrative res judicata effect of TD 392 but also with the administrative res judicata effect of the Land Commission's subsequent determinations of ownership, which were not timely appealed. *See* 2 CMC § 4249. The trial court ruled that the failure to timely appeal the Land Commission determinations of ownership rendered them final.

Our administrative res judicata analysis in *Dela Cruz* related to the finality of land title administrative determinations promulgated pursuant to Office of the High Commissioner, Trust Territory of the Pacific Islands, Trust Territory Land Management Regulation No. 1 (effective June 29, 1953). Our application of the doctrine of administrative res judicata to land title determinations and the exceptions listed above are applicable to this case because, as we will discuss below, the Land Commission ownership determinations rested on TD 392, an erroneous title determination.

■ We acknowledged in *Dela Cruz* the importance of according res judicata effect to administrative adjudications. *Dela Cruz*, 2 N.M.I. at 11 n.7. We stated, however, that administrative decisions are not judicial decisions, and that the policy of according res judicata effect to administrative rulings which appear final must be tempered with "fairness and equity." *Id.* "Neither collateral estoppel nor res judicata is rigidly applied. Both rules are qualified or rejected when their application would contravene an overriding public policy or result in a manifest injustice." *Id.* at 12 n.7.

■ To accord res judicata effect to the Land Commission's ownership determinations would clearly result in manifest injustice. The Commission based its determinations on TD 392, which was issued without basis.

In addition, the conduct of Nicolas's heirs appears to have caused Luis's heirs to refrain from seeking judicial review of the Land Commission title determinations within the requisite 120-day period. After issuance of the Commission ownership determinations, Daniel and Sita wrote a letter to the Commission requesting that the determinations be amended. Although the letter was written more than 120 days after the Commission ownership determinations were issued, the letter shows that no dispute existed between the parties, i.e. all agreed that the Talofofo land belonged to Jose's heirs.

The parties thus sought to correct what they considered to be the Land Commission's error. Their written request followed Daniel's oral request at the hearing to amend the determinations to show that all of Jose's heirs owned the Talofofo land. The Commission made specific note of this oral request in its summary of the hearing, yet it failed to act to correct the error.

Because the Land Commission relied on TD 392 as the basis for its determinations of ownership, and because TD 392 was not supported in the record that was before the Trust Territory Land Title Office in 1952, we hold that the trial court erred in not setting aside TD 392. Based on the following analysis of the record, we find that the documents upon which TD 392 rests do not support the conclusion that Lots 1833 and 1855 passed, after Jose's death, solely to his son Nicolas. The land remains part of the estate's assets. We shall, therefore, not accord res judicata effect to TD 392, nor shall we accord res judicata effect to the Land Commission determinations of ownership based thereon.[6]

---

was the property of Nicolas Ogumoro individually" and (2) "whether Talofofo Property Number 442 is Carolinian family land inherited from Jose Ogumoro and held by the customary trustee for the use of all of the lineal heirs of Jose Ogumoro." Brief of Appellants at 1.

[6] Ownership of the Talofofo land remained the same as the ownership of Lots 1833 and 1855. *See In re Estate of Dela Cruz*, 2 N.M.I. at 13.

## A. The Ownership Character of the Talofofo Land

The estate asserts that the Talofofo land is "Carolinian family land." It argues that, upon Jose's death: (1) Nicolas automatically became the customary trustee of the original land in Garapan, and remained so until his death in 1944; (2) thereafter Pedro, the next oldest child, became the customary trustee until his death in 1948; and (3) Luis, the youngest child, then succeeded Pedro as customary trustee because he had become Jose's sole living child. Brief of Appellants at 10-13.

The appellees, on the other hand, contend that Nicolas "inherited the lots from Jose." Appellees Brief at 2. They argue that the land is not Carolinian family land. *Id.* at 9. However, they acknowledge that "it is not clear whether Nicolas got the lots by inter[]vivos transfer, will, or by intestate succession." *Id.* at 2. Preliminarily, then, we need to examine whether the Garapan land, which was exchanged for the Talofofo land, is Carolinian family land. If it is not, we need to determine whether Jose transferred the Garapan to Nicolas individually.

■■■ "Carolinian land tenure is *matrilineal*" and "descends by the *minimeal* lineage, i.e., mother to daughter." *In re Estate of Rangamar*, 4 N.M.I. 72, 76 (1993). "Carolinian family land" means land owned by a Carolinian family subject to the traditional Carolinian custom of matrilineal land ownership. Likened to a corporate group, the matrilineal lineage "own[s] and control[s]" the land. *Id.* In other words, Carolinian males were traditionally precluded from owning land. However, during the German administration of the northern Mariana Islands (1899-1914), Carolinian men received title to and owned homestead land, which was recorded in their individual names. *Id.* Japanese administrators continued the German system of registering both individually and matrilineally-held Carolinian lands. *Id.*[7]

■ Jose died sometime between 1907 and 1912, during the German administration. The appellants do not dispute that Jose owned the Garapan land individually. Such ownership was contrary to the matrilineal system of land ownership. The appellants argue, however, that after Jose's death, the land somehow assumed the character of Carolinian family land, i.e., matrilineally-held land. We reject this argument because after Jose's death his surviving children were all males, precluding any possibility of the land's ownership being transformed in character from individual male ownership to matri-

lineal ownership. Moreover, Jose himself, because of his gender, could not have owned Carolinian family land, just as he could not have been part of a matrilineal group. Therefore, we conclude that, as a matter of law, the land at issue was not Carolinian family land but land owned individually by Jose.

## B. The Validity of TD 392

Except for TD 392, the appellees do not establish how Nicolas individually became sole owner of the Garapan land. There is no evidence that Jose had a will or conveyed the land to Nicolas alone. Further, the parties did not present evidence of any Carolinian custom regarding succession of individually-held lands by males of Carolinian descent. In short, the record does not support the determination that Nicolas owned the land individually.

Pedro's 1945 statement that his brother Nicolas "own[ed]" the land should be read in context with his other documented statements. *See, e.g.*, ER Exhibit B. In his 1948 statement made after Nicolas's death, Pedro claimed ownership of the land in his name. ER Exhibit C. Later, after Pedro died, Luis claimed the land for himself and Nicolas's children. Luis, together with Nicolas's children, were Jose's only surviving heirs. Luis thus believed he was entitled, at least in part, to Jose's estate. Luis's undated statement states that both Luis and Nicolas's children "own[ed]" the land. ER Exhibit D. Luis also stated: "The above land has been inherited from [our] Father Jose Ogumoro in 1910." *Id.* This statement was not an admission by Luis that Nicolas owned the land individually, or that Luis relinquished his interest in the land.

TD 392 rested primarily on three documents: Pedro's 1945 and 1948 statements and Luis's undated statement made after Pedro's death. The Trust Territory Land Title Office had these three statements before it when it issued TD 392. It nonetheless decided to issue the title determination in the name of the "heirs of Nicolas," but with Luis as land trustee. Viewing these three documents together, we hold that TD 392 erroneously determined Nicolas's heirs to be the owners of Lots 1833 and 1855.

The statements furnished to the Trust Territory Land Title Office before issuance of TD 392 support ownership of the land by the estate. A pattern emerges from these documents. After the war, Pedro stated that Nicolas had inherited the land from Jose. Thereafter, Pedro, as Jose's oldest living heir, claimed the land in his name. After Pedro died, Luis claimed that the land belonged to him (Luis) and Nicolas's children.

---

[7] Although this practice of placing land title in the name of a Carolinian man is inconsistent with the Carolinian matrilineal system, it has continued to the present day and may have effected a change in the Carolinian land tenure system.

Because we conclude that (1) the Garapan land is not Carolinian family land, (2) there is no probative evidence that Nicolas inherited the land in his name alone, and (3) Pedro's and Luis's statements do not support sole ownership by Nicolas, we hold that the record in support of TD 392 is patently inadequate to support ownership solely by Nicolas and his lineal heirs. TD 392 must be corrected; to hold otherwise would, on this record, result in manifest injustice to Luis's heirs. The Talofofo land received in exchange for the Garapan land thus belongs to Jose's estate, not just to the lineal descendants of Jose's son Nicolas.

## IV

In view of the above analysis we **VACATE** the trial court's decision upholding TD 392 and the Land Commission determinations of ownership for Lots EA-422 (1 of 3), EA-422 (2 of 3) and EA-422 (3 of 3). We **RE-MAND** the matter and direct the trial court to (1) include the Talofofo land in the inventory of assets belonging to Jose's estate, and (2) conduct further proceedings regarding the distribution of the Talofofo land and distribute it pursuant to any mutual agreement of the parties or pursuant to any known Carolinian custom on land descent that is applicable. In the absence of any such custom, the Talofofo land shall be distributed in accordance with the common law relating to intestate succession.